**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 10-633-1 |
| v. | |
| JOSEPH POLLARD | |

### MEMORANDUM OPINION

Joseph Pollard, an inmate at Federal Corrections Institution ("FCI") Fort Dix, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), in light of the passage of the First Step Act ("FSA"), which substantially lowered the mandatory minimum he would be subjected to if sentenced today. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5222, § 403. He also points to his demonstrated rehabilitation, his good behavior while incarcerated, his lack of a history of violent crime before engaging in the acts for which he was sentenced, and the job he says he has been offered if he is released.

**I.   BACKGROUND**

On February 27, 2012, Defendant pled guilty before the Honorable Judge Legrome Davis, to counts one through six and eight of a Superseding Indictment, charging him with one count of conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a); four counts of interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a); and two counts of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Pollard entered into a plea agreement with the Government. By its terms, *inter alia*, the Government agreed that if Pollard fulfilled the plea agreement's cooperation requirements, it would, at the time of sentencing, make the extent and nature of his cooperation known to the Court and move for a departure below the mandatory

1

minimum set forth in the sentencing guidelines.

The guilty plea was based on the following facts, which Pollard admitted to at his plea hearing. On April 26, 2010, Pollard robbed a pharmacy at gunpoint and left the store with 10 bottles of oxycontin. On June 5, 2010, he robbed another pharmacy for oxycontin—again at gunpoint—while a co-conspirator served as a lookout. On June 19, 2010, Pollard remained in the car while the same co-conspirator robbed a different pharmacy. Finally, on July 15, 2010, Pollard remained in the car as two co-conspirators robbed another pharmacy at gunpoint. Pollard drove the co-conspirators back to Pollard's house, where the proceeds were divided. The firearm used in the robberies was registered to Pollard. When Pollard was questioned by police, he immediately admitted his involvement. He went on to cooperate extensively with the Government.

Pollard was sentenced on June 13, 2012. At that time, Pollard's violations of Section 924(c), use of a firearm during a crime of violence, required a mandatory minimum of seven years on the first count and a consecutive 25 years on the second, for a total mandatory minimum on all of his crimes of 384 months, or 32 years. In light of Pollard's cooperation, however, the Government moved for a departure, and he was sentenced to 180 months, or 15 years, in jail. Pollard is currently scheduled for release on May 25, 2023.

**II.     DISCUSSION**

Pollard's motion raises two questions that must be addressed: (1) what decisional standards govern his motion; and (2) does he qualify under those standards for compassionate release? Pollard filed his motion pursuant to 18 U.S.C. § 3582(c)(1)(A), which provides:

> (c) Modification of an imposed term of imprisonment.
> The court may not modify a term of imprisonment once it has been imposed except that—
>     (1) in any case—

> (A) the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. . . .

18 U.S.C. § 3582(c)(1)(A) (emphasis added). The italicized text was added to the statute by the FSA. *See* 132 Stat. at 5239, 603(b). Prior to its passage, district courts could only grant compassionate release modifications upon motion of the Director of the Bureau of Prisons ("BOP"). *United States v. Maumau*, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020). Now, a prisoner may bring a motion on his own behalf, so long as he has exhausted his administrative remedies. *Id.* Neither party contests that Pollard appropriately exhausted his remedies here.

Pollard's primary basis for seeking compassionate release rests in another change made by the FSA: as part of the Act, Congress recast the consecutive stacking provision of Section 924(c), which required imposition of consecutive seven- and 25-year terms of imprisonment for two gun violations pursuant to that Section, even if both convictions stemmed from the same indictment. *Id.* at *5. The FSA clarified that now, the stacking provision is only triggered if the second offense occurs *after* a final conviction on the first one; it is not triggered if a defendant is charged with two violations in the same case. *Id.*; *see* 132 Stat. at 5221-22, § 403(a). If sentenced for the crimes to which he pleaded guilty today, Pollard would be subject to a 168-month mandatory minimum for all of his offenses, as opposed to the 384-month one he faced in 2012. Pollard thus argues that, combined with other factors indicating his rehabilitation and

3

remorse, this constitutes an extraordinary and compelling circumstance worthy of a modification of his sentence.[1]

### A. Enforceability of the Sentencing Guidelines

Section 3582(c)(1)(A) provides that compassionate release shall only be granted in extraordinary and compelling circumstances—but Congress did not define in the statute what circumstances meet that criteria. It provided only one limitation: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Beyond that, it directed the Sentencing Commission to promulgate "general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18 [that] describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." *Id.* The FSA left unchanged Section 3582(c)(1)(A)'s mandate that any relief granted be "consistent with applicable policy statements issued by the Sentencing Commission."

Prior to the passage of the FSA, the Sentencing Commission had issued guidelines providing for four situations in which compassionate relief is appropriate. *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.1 (U.S. Sentencing Comm'n 2004). The first category regards prisoners with terminal medical conditions, the second deals with prisoners of advanced age, and the third applies when a prisoner becomes the sole available caregiver for a child, due to the death or incapacitation of the other parent. *Id.* at n.1(A)-(C). The final provision is a catchall, which allows relief when, "[a]s determined by the Director of the Bureau of Prisons,

---

[1] As the Government notes, and Pollard concedes, the FSA does not make the sentencing changes to Section 924(c) retroactive. 132 Stat. at 5221-22, § 403(b). Pollard, however, does not argue that he is entitled to re-sentencing because of the changes to Section 924(c); rather, his argument is that his sentence should be modified pursuant to Section 3582(c)(1)(A) because he presents extraordinary and compelling circumstances.

there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id*. at n.1(D).[2] Pollard concedes that the first three categories do not apply to him; he seeks relief only under Subsection D.

The Supreme Court has found that Guidelines pertaining to sentencing modifications, such as the ones described above, are binding on courts. *Dillon v. United States*, 560 U.S. 817, 829-30 (2010). Although, *Dillon* concerns a different provision of Section 3582 (specifically, Section 3582(c)(2), which sets forth rules regarding sentencing modification when the Commission has adopted a retroactive guideline amendment that lowers the guideline range, *id*. at 819), it is instructive here. In *Dillon,* the Supreme Court noted that Section 3582(c)(2) "does not authorize a sentencing or resentencing proceeding. Instead, it provides for the 'modif[ication of] a term of imprisonment' by giving courts the power to 'reduce' an otherwise final sentence in circumstances specified by the Commission." *Id.* at 825. That modification could only occur after courts engage in a two-step process, whereby they first determine if the change is consistent with the guidelines, then determine if it is "authorized . . . according to the factors set forth in § 3553(a)." *Id.* at 826. Thus, it is a permissible exercise of judicial discretion.

Unlike *Dillon*, this case involves Section 3582(c)(1)(A). However, the operative language and policies underlying the Court's rationale inform our analysis. Like Subsection (c)(2), Subsection (c)(1)(A) authorizes only a *modification* to a sentence, if it is consistent with the guidelines and the Section 3553(a) factors—thus mandating the same two-step process of

---

[2] Addressing subsection (D), BOP issued a regulation defining its own consideration of requests for compassionate release. That regulation appears at Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This statement was amended effective January 17, 2019, following passage of the First Step Act.

review.  *See United States v. Adeyemi*, 2020 WL 3642478, at *12 (E.D. Pa. July 6, 2020).  And like in *Dillon*, the modification reflects an exercise of the court's discretion.  Indeed, the guideline at issue in *Dillon* provided explicit limits on the court's discretion, namely that it could not modify the new sentence to a term of imprisonment lower than the minimum amended range (unless the original term was likewise below-guidelines), *id.* at 819, whereas here, courts are left with full discretion to determine whether and how a given defendant fits into the guideline provisions and how the sentence should be modified.  *See* § 1B1.13 cmt. n.1.

But the issue here is not whether, as a general matter, guidelines regarding sentencing modifications are binding.  The issue here is that the guideline has not been updated by the United States Sentencing Commission since the implementation of the FSA—thus the language of the guideline is currently contrary and at odds with the language of this new statute.  The reason it has not been updated is because the terms of three of the five U.S.S.G. commissioners have expired and no replacements have been made.  Accordingly, no new or amended guidelines have been issued since the end of 2018, as the Sentencing Commission "lacks a quorum to amend the U.S. Sentencing Guidelines."  *United States v. Beck*, 425 F. Supp.3d 573, 579 n.7 (M.D.N.C. 2019).  And, "it seems unlikely there will be a policy statement applicable to motions brought by defendants in the near future."  *Id.*

According to the Government, unless and until the Commission amends § 1B1.13 of the guidelines, the current language of the catchall provision (apart from as it concerns who can make a motion for compassionate release) is still binding and only the BOP Director can determine whether extraordinary and compelling circumstances outside the three specifically delineated ones exist.  Before congress passed the FSA, this grant of discretion to the BOP made good sense—as only the BOP could motion for compassionate release, it followed naturally that

the BOP would have the discretion to determine whether a defendant's circumstances fell under the catchall provision. *See United States v. Cantu*, 423 F. Supp.3d 345, 351 (S.D. Tex. 2019).

But following the FSA, defendants "no longer need the blessing of the BOP" to bring compassionate release motions. *Id.* Indeed, if 30 days elapse without BOP action on a defendant's application and the defendant exercises his right to bring the suit to the district court, then it may very well be the case that the BOP may *never* weigh in on a defendant's motion. *See United States v. Rodriguez*, 2020 WL 1627331, at *5, -- F. Supp.3d ---- (E.D. Pa. Apr. 1, 2020). A question of statutory interpretation thus arises: does the guideline's delegation of discretion over the catchall provision to only the BOP conflict with the FSA?[3] When two statutes conflict, it is near-axiomatic that the most recently enacted statute receives preference over the older one. *See Cantu*, 423 F. Supp.3d at 350 (*citing* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 327 (*quoting* The Federalist, No. 78, at 468 (Clinton Rossiter ed. 1961))). This principle is even more salient in the context of sentencing guidelines, as guidelines simply are "the equivalent of legislative rules adopted by federal agencies" which are intended to "assist in the interpretation and application of those rules." *Stinson*, 508 U.S. at 45. As such, Congress can and does override the Commission's policy statements by statute, or otherwise amend the underlying law such that some provisions of a policy statement "no longer explain an appropriate use under the amended statute." *Cantu*, 423 F. Supp.3d at 350. The job of the Court is to "to make sense rather than nonsense out of the corpus juris" of the FSA. *Id.* at 351 (*quoting W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 101 (1991)). Here, the corpus juris consists of: the FSA, the text of Section 3582(c)(1)(A), its relevant policy statement (U.S.S.G. § 1B1.13), and

---

[3] To date, no Court of Appeal has decided this issue. *See United States v. Handerhan*, 789 F. App'x 924, 925 n.1 (3d Cir. 2019) (noting that the "District Courts are divided on whether and how to apply the catch-all 'other reasons' category" and declining to address that issue).

the statute granting the Commission authority to promulgate that policy statement (28 U.S.C. § 994).  *See id.*  These must all be taken into account in determining whether the language of the catchall provision now conflicts with Section 3582(c)(1)(A), as amended by the FSA.

The conclusion that the FSA and the guidelines conflict is wholly inescapable in at least one aspect: the policy statement explicitly still provides that compassionate release can "be granted only upon motion by the" BOP.  U.S.S.G. § 1B1.13 cmt. n.4.  The Government cannot deny that such language no longer comports with the FSA, but it makes no effort to distinguish why the Court should decline to implement that limitation of authority to the BOP, yet continue to limit the applicability of the catch-all provision to only the BOP's discretion.

Turning to the catchall provision itself, it is evident that to continue limiting discretion over its operation to the BOP conflicts with the FSA.  The catchall provision is designed specifically to provide flexibility in considering whether a compassionate release motion should be granted; it reflects a determination on the part of the Sentencing Commission that it "may be impossible to definitively predict what reasons may qualify as 'extraordinary and compelling.'" *Rodriguez*, 2020 WL 1627331, at *5.  Instead of trying to anticipate all circumstances, "the Commission covered all of its bases [through the] flexible catchall provision."  *Id.*  To deny courts that flexible provision would greatly hamper the relief available to defendants.[4]

---

[4] Under the Government's read, that catch-all determination can *only* be made by the BOP, not the court independently.  Thus, in a circumstance like Pollard's, where the BOP failed to exercise its discretion, if this Court cannot independently apply the catch-all, Pollard seemingly loses the benefit of the provision's flexibility.  *Id.*  It would be a "strange remedy indeed" if Section 3582(c)(1)(A) provided that, although prisoners could, if the BOP failed to act on their application within 30 days, file directly in the district court, they could only do so "by accepting a pared-down standard of review that omitted the flexible catchall standard."  *Id.*  But that is precisely what would happen if, as the Government argues, only the BOP Director can identify whether the circumstances presented by the defendant warrant compassionate release.  *Id.*; *see also Adeyemi*, 2020 WL 3642478, at *14 (noting that Congress would not "streamline compassionate release motions only to" then "penalize[] the incarcerated person who qualifies for compassionate release based on 'other' reasons").

8

Consideration of the purposes of Congress' passage of the FSA further confirms this conclusion. The compassionate release provision has historically been utilized infrequently; until 2013, on average, only 24 incarcerated persons were released each year. *See United States v. Brown*, 411 F. Supp.3d 446, 450-51 (S.D. Iowa 2019). Following complaints to the BOP from the Inspector General's Office in 2013, that number rose in the next year to 83 inmates. *See id.* But "one can infer Congress thought eighty-three was still insufficient," *id.*, because Congress then went on to pass the FSA—and titled the provision of the Act modifying Section 3582(c)(1)(A) to allow defendants to bring their motion directly to the court upon a failure of the BOP, "*Increasing* the Use and Transparency of Compassionate Release." 132 Stat. at 5239, § 603(b) (emphasis added); *see also* Scalia & Garner, *supra*, at 221 (noting that, because the title is adopted by the legislature, it can provide useful insight). Assuming that the BOP Director "faithfully executes the narrowly drawn policy and program statements related to compassionate release," the only way that "direct[ing] motions to district courts would increase the use of compassionate release" would be if it "allow[ed] district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" *Brown*, 411 F. Supp.3d at 451.

The Court thus joins most other district courts in concluding that, to the extent Section 1B1.13 of the guidelines purports to grant only the BOP discretion over the applicability of the catchall provision, it is no longer applicable.[5] Eliminating—as the Government would have it—

---

[5] *See, e.g.*, *Clausen*, 2020 WL 4260795, at *4; *Adeyemi*, 2020 WL 3642478, at *14; *Rodriguez*, 2020 WL 1627331, at *4; *United States v. Schmitt*, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Valdez*, 2019 WL 7373023, at *2-*3 (D. Alaska Dec. 31, 2019); *United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *Beck*, 425 F. Supp.3d at 579-80; *United States v. Rivernider*, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019).

*But see United States v. Lynn*, 2019 WL 3805349 (S.D. Ala. Aug. 13, 2019) (concluding that sole discretion still lies with the BOP, and "the only purpose of the 30-day period is to provide a trigger for the filing of a judicial motion,

from district courts the ability to flexibly assess whether a defendant is entitled to compassionate release directly conflicts with the FSA. This conflict now leaves a "gap . . . that no 'applicable' policy statement has addressed." *Rodriguez*, 2020 WL 1627331, at *4. The Court therefore maintains independent discretion over whether "extraordinary and compelling reasons" exist. *Id.*

### B. Pollard's Motion for Compassionate Release

Having determined that the Court is authorized by the FSA to exercise its independent discretion to decide this matter, the substance of Pollard's motion is now considered. This requires engaging in a two-step process: first it must be addressed whether "extraordinary and compelling reasons warrant [] a reduction," and if so, the sentencing factors found in 18 U.S.C. § 3553(a) must be considered "to the extent" they are applicable. 18 U.S.C. § 3582(c)(1)(A).

#### 1. Extraordinary and Compelling Circumstances

The text of Section 3582(c) does not provide meaningful guidance on what is considered an "extraordinary and compelling" circumstance, aside from a direction that rehabilitation alone is not enough. *Cantu*, 423 F. Supp.3d at 352. And so, in the absence of any statutory definition, the ordinary usage of the terms is considered. *Id.* "Extraordinary" is defined as "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (10th ed. 2014). And, "extrapolating from [the] definition of 'compelling need,'" *Cantu*, 423 F. Supp.3d at 352, a compelling reason is one that is "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Compelling Need*, Black's Law Dictionary (10th ed. 2014).

---

not to preclude BOP from providing a court its assessment of the request"); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019) (noting that defendant had "not cited, and the Court has not discovered, any authority for the proposition that the Court may disregard guidance provided by the Sentencing Commission where it appears that such guidance has not kept pace with statutory amendments" but concluding that even if the guidelines were not binding, defendant did not present extraordinary and compelling circumstances); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019) (concluding without analysis that "Defendant has failed to demonstrate how the policy statement addressing extraordinary and compelling reasons conflicts with the First Step Act's amendments to § 3582").

Further, although the guideline policy statements are no longer binding to the extent they conflict with the FSA, much of the policy notes remain useful. *See Beck*, 425 F. Supp.3d at 580. Thus, the reasons presented by the defendant "need not have been unforeseen at the time of sentencing." U.S.S.G. § 1B1.13 cmt. n.2. And, while "rehabilitation . . . is not, by itself, an extraordinary and compelling reason," it may be considered in combination with other factors. *Id.* § 1B1.13 cmt. n.3; *see also Brown*, 411 F. Supp.3d at 449. "Read as a whole, the application notes suggest a flexible approach which considers all relevant circumstances." *Beck*, 425 F. Supp.3d at 582.

The primary (but not exclusive) impetus for Pollard's motion for compassionate release is the vastly different mandatory minimum he would face if he was sentenced today compared to when he was originally sentenced. At sentencing, Pollard faced a mandatory minimum of 384 months' imprisonment; today, he would face just 168 months. Following the Government's motion for a departure, Pollard was actually sentenced to 180 months, still 12 months higher than the current mandatory minimum.

The substantial change in the length of sentence is a relevant consideration for whether Pollard is entitled to compassionate release. *See, e.g.*, *Maumau*, 2020 WL 806121, at *6. While it remains true that Congress could have, but chose not to make its changes to Section 924(c) apply retroactively, that ultimately holds little sway over consideration of the present motion. *Id.* at *7. It is reasonable for Congress to have concluded that, while not all defendants convicted under that provision would be entitled to a modification of their sentence, some may be entitled to such, on a case-by-case basis—through the expanded compassionate release provision provided for in the FSA. *Id.*; *see also Urkevich*, 2019 WL 6037391, at *2. This conclusion is confirmed by the Senate Report that accompanied the Sentencing Reform Act of 1984, the

11

statute that first authorized the BOP to oversee compassionate release motions. *Maumau*, 2020 WL 806121, at *6 (citing S. Rep. No. 98-225, at 55-56 (1984)). In that report, Congress indicated that relief may be appropriate, *inter alia*, in "cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment." *Id.* Thus, Congress explicitly contemplated that changes to the length of a sentence can be an appropriate consideration in deciding whether to grant compassionate release.

The Government's argument that taking into account the length of Pollard's sentence would undermine the finality of judgments does not counter otherwise. It cites to *Teague v. Lane*, 489 U.S. 288 (1989), which provides that finality "is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Id.* at 309. While recognizing the importance of this consideration, such a concern is present with *every* compassionate release motion—by their very nature, no matter their underlying reason, compassionate release alters the finality of a sentence. But Congress created the compassionate release statute anyway, and with the FSA, granted courts the ability to hear and decide those positions. *Adeyemi*, 2020 WL 3642478, at *25. It is assumed that Congress considered the deterrent impact, if any, of the compassionate release provision when it was passed. *Id.* "The province of the judiciary is not to second-guess policy decisions of Congress; we will not decline to apply a duly enacted statute on the grounds our policy preferences are superior to Congress's." *Id.*

While Pollard focuses on the vastly different mandatory minimum he would face if sentenced today he also points to other factors to support his motion. While incarcerated, Pollard

says that he has made productive use of his time. He has held numerous jobs; currently, he serves as an orderly in his housing unit and has achieved the highest grade possible in that capacity. He also says he is a regular participant in the prison's recreational activities, reads many books, and faithfully attends religious services. While Pollard concedes his disciplinary record from his time incarcerated is not wholly blemish free, the Government does not challenge Pollard's assertion that he was not involved in any major or violent infractions. This evidence of Pollard's rehabilitation, although alone insufficient, weighs in his favor. *See Adeyemi*, 2020 WL 3642478, at *26 (considering defendant's consistent employment and participation in prison-sponsored activities, and noting that although defendant committed four disciplinary infractions, none were for major or violent actions); *Rodriguez*, 2020 WL 1627331, at *10 (considering defendant's employment and enrollment in classes, and noting that defendant had only two disciplinary infractions, neither of which were for violent behavior).

Additionally, upon release, Pollard says he has concrete plans, specifically asserting that his uncle will provide him with a place to live, and that he as an outstanding job offer from a property management company. Further, according to Pollard, he has certifications in the information technology field that will provide him access to further employment potential. *See Adeyemi*, 2020 WL 3642478, at *28 (noting the relevance of a defendant's release plans).

Finally, although the crimes Pollard committed were no doubt serious—and it is not downplayed that he played a central role in them—it remains meaningful that, prior to the 76-day robbery spree giving rise to his convictions, Pollard had no criminal history, aside from a dishonorable discharge from the military. The discharge, however, was not for a violent crime; it was primarily predicated on his failure to report for duty. During his time enlisted, he achieved the rank of a Lance Corporal.

Taking into account the dramatic difference in the sentence Pollard would face if charged today, the evidence of rehabilitation and productive use of time while incarcerated, his stated plans for gainful employment upon release, and his lack of a prior criminal history, it is found that Pollard's circumstances go "[b]eyond what is usual, customary, regular, or common" for a defendant subject to the old sentencing provisions for a Section 924(c) violation.  *See Extraordinary*, Black's Law Dictionary (10th ed. 2014).  He thus has established extraordinary and compelling circumstances.  *See Maumau*, 2020 WL 806121, at *5 (holding that the defendant's "age, the length of sentence imposed, and the fact that he would not receive the same sentence if the crime occurred today all represent extraordinary and compelling grounds to reduce his sentence").

2.  Consideration of the Section 3553(a) Factors

The inquiry does not end at the conclusion that extraordinary and compelling circumstances were present, however; any modification to Pollard's sentence must also be consistent with the applicable factors found in 18 U.S.C. § 3553(a).  As relevant here, those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>         (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code . . .

14

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .

18 U.S.C. § 3553(a).

Turning to the nature and circumstances of the offense, and Pollard's characteristics. As discussed *supra*, Pollard was convicted of brandishing a firearm in the course of committing multiple robberies. Pollard was an active participant in the scheme—in two of the robberies he demanded at gunpoint pharmaceuticals from the store clerk himself, and in the others, he was present in the getaway car. But, again, Pollard had no history prior to this short spree of robberies of committing any violent crimes. His record reflects gainful employment for most of his life before and during his incarceration, and he says he has been an active participant in FCI Fort Dix's community, involved with recreational activities and religious services. Additionally, Pollard cooperated with law enforcement immediately upon his arrest. He promptly indicated his willingness to plead guilty and provided significant assistance to the Government in preparing its cases against his two co-conspirators.[6]

The sentence must also reflect the seriousness of the offense, promote the rule of law, and provide deterrence to criminal conduct, and must further adequately protect the public from future crimes of the defendant. As noted, prior to committing the crimes for which he is incarcerated, Pollard had no criminal history, and the crimes for which he was convicted took place over the span of less than three months—suggesting that these crimes were an outlier from his otherwise lawful behavior. Combined with Pollard's demonstrated rehabilitation and overall good behavior while incarcerated, it does not appear that there is a continued need to protect the public from any future crimes. *See Rodriguez*, 2020 WL 1627331, at *11 (finding that, even

---

[6] The extent of Pollard's cooperation is reflected in the significant downward departure he was granted from the mandatory minimum in his case.

15

though defendant had a significant criminal history, after 17 years of incarceration and good behavior, he did not pose a danger to the community).  Nor would continued incarceration be necessary to provide Pollard with educational or vocational skills.  He says that he already holds multiple technical certifications and has a job lined up were he to be released.  Finally, the modified sentence must avoid unwarranted disparities among defendants with similar records.  18 U.S.C. § 3553(a)(6).  In light of the departure sought by the Government and which the Court granted, Pollard already received a significantly shorter sentence than others who were similarly situated to him but who did not cooperate.  But despite that departure, he is now serving a sentence longer than even the mandatory minimum that others who committed the same crimes as he did would be facing if sentenced today.  Modifying his sentence would not create any unwarranted disparities—and indeed, would help avoid them.  *See Rodriguez*, 2020 WL 1627331, at *12.  Granting his motion is thus consistent with the Section 3553(a) factors.

The final question thus becomes: based on the sentences available, what is the appropriate length to which Pollard's sentence should be modified?  Today, Pollard would be subject to a 168-month mandatory minimum, as opposed to the 384-month one he faced when he was sentenced.  As mentioned, because of Pollard's extensive cooperation with the Government's investigation, he received a sizeable downward departure to 180 months.  By Pollard's reasoning, if sentenced now, he would receive the benefit of a similarly sizeable departure, subjecting him to around 79 months' imprisonment, and making him eligible for immediate release.  The import of the departure Judge Davis granted cannot be so readily quantified—its size may have reflected, at least in part, just how high the mandatory minimum used to be for Section 924(c) crimes.  *See, e.g.*, *Maumau*, 2020 WL 806121, at *5 (noting that the sentencing transcript contained multiple references to concern over how long of a mandatory

16

minimum the guidelines mandated).  Faced with the now much lower mandatory minimum of 168 months, the Court cannot say with confidence that Judge Davis would have still granted such a sizeable departure.  Instead, what must be done is to assess an appropriate sentence to reflect the Section 3553(a) factors as discussed *supra*.  It is held that, particularly in light of the seriousness of Pollard's crimes, modifying his sentence to the current mandatory minimum of 168 months is appropriate.

### III.   CONCLUSION

Pollard's motion for compassionate sentencing modification is granted and his sentence shall be modified to 168 months' incarceration.

**August 12, 2020**                                                      **BY THE COURT:**

*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**